ROGERS, Justice.
 

 Fred Graffam was convicted of the murder of Mary Campbell and sentenced to death by electrocution. His appeal is based upon sixteen bills of exception reserved in the trial court and an assignment of errors filed in this court.
 

 Defendant’s first complaint in his assignment of errors is that the trial judge assumed the role of prosecuting attorney, assisting the district attorney in examining the witnesses for the State, and, in many
 
 *876
 
 instances, instructing him how to proceed. In their brief, counsel for defendant quote extensively from the record in support of defendant’s complaint.
 

 We are unable to consider defendant’s complaint since no bills of exception were reserved showing the facts, the objections urged, and the rulings thereon. We will say, however, that it is the duty of counsel for the State to present its case, and the judge should refrain from assuming the role of counsel, or indicating a desire to assist either side. It is proper, however, for him to inform himself on preliminary questions which arise in the case. State v. Doiron, 150 La. 550, 90 So. 920.
 

 The general rule governing such matters is stated in 16 Corpus Juris, Criminal Law, § 2100, page 831, as follows:
 

 “For. the purpose of eliciting evidence which has not otherwise been brought out, it is proper for the judge to put questions to a witness either on his examination in ch'ief or on his cross-examination, and where anything material has been omitted, it is sometimes his duty to examine a witness. The judge may recall and examine .a witness in order to supply an omission of proof on a material point. But he must conduct his examination in such a manner as to impress the jury with the idea that he is entirely impartial, and he must also conduct the examination in such a way as not to indicate his opinion on the merits or any doubt as to the credibility of the witness. He should not ask a question which is based upon the assumption of defendant’s guilt of the offense charged.” See, also, 23 C.J.S., Criminal Law, § 991.
 

 Defendant’s other complaints in his assignment of errors are directed against the rulings of the trial judge as set forth in certain bills of exception. We shall discuss these complaints in considering the merits of the bills themselves.
 

 Bill No. 1. This bill was reserved during the examination of Bertha Morales, a negro maid employed in the Gardner Hotel where the homicide occurred. The bill shows that the district attorney propounded the following question to the witness: “What happened between the defendant ,and the deceased on Friday (two days) before the alleged homicide?” Counsel for defendant objected to the testimony on the ground that it was irrelevant and had no bearing upon the issue before the court. After the objection was made, the trial judge requested Mr. Becker, one of the defendant’s attorneys, and Mr. Lozes, the assistant district attorney, to come to the Bench where Mr. Lozes told the judge, out of the hearing of the jury, that his purpose was to offer proof of the fight or disturbance which occurred between the defendant and the deceased two days before the homicide. The witness, Mary Morales, testified in substance that at about
 
 7
 
 or 7:15 o’clock on the evening of Friday, March 29, 1940, she was downstairs in the Gardner Coffee Shop, engaged in performing her duties, when she heard a scream and immediately ran upstairs. The scream came from the room occupied by the defendant and the deceased. When asked what happened when she got there, the witness testified as follows: “Well, they were fighting. He had her on the bed, choking her. He said,
 
 *878
 
 T am
 
 going to kill you;’
 
 ‘I am going
 
 to
 
 kill you.’ I asked him to stop fighting and he would not stop, so I ran downstairs and called Mr. Cashe.”
 

 The record indicates defendant’s defense was that the deceased had met her death accidentally when she attempted to prevent the defendant from committing suicide. This defense necessarily denies that the killing was intentional. But this defense does not shift to a defendant the burden of proving that the homicide was caused by an accident. On the contrary, where the defense of accidental killing is set up, according to the general rule, the burden rests upon the State to show that the killing was wilful and intentional. 26 Am.Jur. (Homicide), § 290, p. 354.
 

 The purpose of the State in offering the alleged objectionable testimony was to show that an altercation took place between the defendant and the deceased two days prior to the homicide, and that in the course of the altercation the defendant declared his intention of killing the deceased.
 

 The testimony was properly admitted not only because it tended to establish malicious intent, an element of the crime charged, but also to negative defendant’s contention that the killing was the result of an accident. The testimony was not too remote for the purpose for which it was offered.
 

 In a prosecution of murder, proof of prior difficulties between the accused and deceased, and of a prior attempt by the former on the life of the latter, is admissible in evidence to show motive and malice in the killing. State v. Clark, 119 La. 733, 734, 44 So. 449.
 

 While, as a general rule, a distinct crime, unconnected with the one charged in the indictment, can not be given in evidence, exceptions to the rule arise when it becomes necessary to rebut the possible inference of accident, or to prove the intent with which the act charged was committed. State v. Williams, 111 La. 179, 35 So. 505. See, to the same effect, State v. Anderson, 45 La.Ann. 651, 12 So. 737, where it was also held that threats against the deceased are always admissible to show malice in a trial for murder.
 

 Threats made by the accused against the deceased may be offered in evidence to show malice and motive. State v. Carriere, 141 La. 136, 74 So. 792.
 

 Bill No. 2. This bill presents the question of the admissibility of testimony given by the witness, Bertha Morales, as to whether the deceased was wearing certain rings given her by the defendant. The homicide took place on a Sunday, and the witness was interrogated by the prosecuting attorney as to whether the defendant was wearing the rings on the day of the homicide, as well as on the preceding Tuesday, Wednesday, Thursday, Friday and Saturday. She testified that the deceased was wearing the rings on Wednesday, but she was not positive as to whether the deceased was wearing the rings on the other days. The evidence was not admissible and defendant’s objection should have been sustained. The fact that defendant gave the deceased the rings and that she was wear
 
 *880
 
 ing them on Wednesday was wholly irrelevant to establish the contention of the State that defendant and the deceased were living together in the relationship of husband and wife.
 

 Bills Nos. 3, 4 and 5 were reserved in connection with certain testimony given by Nicholas J. Martino, a police officer, relative to the contents of the Evidence Book of the Third Precinct Police Station in New Orleans.
 

 Counsel for defendant objected to the officer reading the entries in the book, to the offer of the book in evidence, and to the further offer in evidence of a certain revolver and certain cartridges.
 

 Officer Martino testified that the entries in the Evidence Book were made by him and by Sergeant Hand in his presence. He called off to Hand the name of the defendant, the name of the deceased, the number 326472 on the 38 calibre pistol, which was given to him at the Gardner restaurant by Robert Ridle, a state witness. In addition to these entries relative to three discharged cartridges and two loaded cartridges, the book contained a notation that the property was received from Patrolman Nick Martino on March 31, 1940, at 10:15 P. M. The signature of Patrolman Martino was appended to the memoranda entered in the book. The witness identified the pistol as the one which was given him by the witness Ridle on the scene of the homicide, which he subsequently handed to Sergeant Hand for the purpose of making the notation in the Evidence Book. By some peculiar markings, he also identified the five cartridges which had been removed from the pistol. There is no error in the rulings, complained of.
 

 Bills Six, Seven, Eight, and Nine were abandoned by the appellant, and it will therefore not be necessary to discuss them.
 

 Bill No. 10 exhibits reversible error. The hill discloses that while Detective Joseph G. Schwehm of the New Orleans police force was on the stand testifying as a witness for the State in the presence of the jury, he was asked certain questions by the district attorney tending to elicit from the witness “a confession and admission of guilt by defendant just after he was brought from the ambulance into the emergency ward of Charity Hospital for treatment of a gun-shot wound in his left chest, and he was suffering from acute shock, and hemorrhage, with his blood pressure being 60 over 30 (60/30), and the intern in charge after viewing his condition was compelled to administer morphine, infusion of Gleucose Saline and a blood transfusion, and defendant was in such a delirium that it became necessary for the doctor and his assistants, and nurses to do all in their power to hold him down and quiet him.”
 

 Defendant, through his attorneys, objected to the introduction of the testimony “on the grounds and for the reasons, that defendant was incapable of knowing what he was saying or doing on account of both his physical and mental condition, and further that under the circumstances and conditions said confession or admission of guilt was not a free and voluntary confession or admission within the meaning of the law, nor was it freely and voluntarily
 
 *882
 
 made, and was therefore inadmissible as ■evidence against defendant, but was clearly and manifestly prejudicial to the interest of defendant, and therefore deprived him of a fair and impartial trial.”
 

 The trial judge overruled the objection, due exception being reserved, and permitted the testimony to go to the jury. The reasons assigned by the trial judge for his ruling are set forth in the per curiam attached to the bill. They are as follows:
 

 “Bill of Exception No. 10 was reserved incidental to the examination of State witness, Police Lieutenant Schwehm. A consideration of this testimony will show there is no suggestion that the defendant’s answers to Lieutenant Schwehm’s questions were not freely and voluntarily made, nor is there anything suggesting that the defendant Graffam’s physical and mental con- . dition was abnormally bad. The statements of Graffam at the time were made very shortly after the shooting of Mary Campbell and one is struck by the apparent truthfulness of the same. He; the defendant, said nothing at the time about any attempt of Mary Campbell to prevent him, the defendant, from shooting himself, nor anything about her supposed accidental shooting, which he, defendant, covered in his testimony at the trial; and Lieutenant Schwehm’s testimony on cross-examination merely cleared up his direct testimony, but did not affect his credibility.”
 

 Detective Schwehm testified as follows:
 

 “I then asked Mr. Graffam how he felt. He said, ‘Pretty good for the condition I am in.’ I said, ‘Do you think you are going to die?’ He said, ‘Hell, no, a piece of lead like this would not kill me.’ I then asked him what was his name. He said, ‘By-the-way, what is your name and who are you?’ I explained that I was Lieutenant Schwehm of the police department. He said to me, ‘You don’t look like a policeman, seem to be a pretty good fellow.’ I said, ‘Thank you.’ I said, ‘What is the trouble, old man?’ He said, Well, it is the same old story,’ he says, ‘you. can’t live with ’em and you can’t live without ’em.’ He says, When I had money,’ he says, T had her; when I lost my money, I lost her.’ He said, ‘This morning just before the shooting,’ he said, ‘everything looked pretty bright for me; I walked into the restaurant and spoke to her and it looks like she was going to come over by my side, and I returned a little later on in the evening and she had changed altogether and said she was through. I then came back prior to the shooting then and I asked her what you intend to do. She said, ‘From now on and ever, I am through with you.’ Then I told her to put her sandwich down, and she did, and while putting it down, he says, ‘I shot her.’ I said, ‘How many times did you shoot her?’ He said, Well, I don’t know if it is once or twice, and she fell back behind the counter and I went back also and put the gun on myself, and that is the story.’ So, I asked him did he care if I take this down in longhand writing, would he sign the statement. He said, ‘Hell, no, that is sufficient enough.’ He said, ‘You know the story,
 
 *884
 
 and that is all there is to it,’ and that is all there was to it.”
 

 It appears from the record-the deceased and the defendant were residing at the Gardner Hotel, No. 225 Bourbon Street, in the City of New Orleans. The deceased was shot in the restaurant, or coffee shop, of the hotel on the night of Sunday, March 31, 1940, shortly before ten o’clock. After the deceased fell to the floor, the defendant called for help and then placing the pistol near his heart fired a shot into his own body. When the police arrived on the scene, they found the defendant lying on the floor near the body of the deceased, and they sent him to the Charity Hospital where he was examined by the doctors in charge at 10 o’clock the same night.
 

 The only evidence offered on the question as to whether the defendant’s oral confession was freely and voluntarily made, was the testimony of ■ Detective Schwehm which was offered by the State, and a, certified copy of th'e hospital records, which was offered by the defendant under the provisions of Act 90 of 1938, to show the physical and mental condition of the defendant at the time the confession was received by the police officer.
 

 Detective Schwehm testified that he re^ ceived information about the shooting of the deceased some time between 9:30 and 9:45 o’clock on the night it occurred while he and his partner were patrolling the city in a police car. He drove to the scene of the killing and ascertained that the defendant had been taken to the Charity Hospital. He immediately drove to the hospital where he arrived between 10 and >10:15 o’clock The hospital records show that when the defendant was seen by the doctors in the accident room of the hospital at about 10 o’clock, he was suffering from a self-inflicted gunshot wound of the left chest, pallor and cold sweat, acute shock, and blood pressure 60/30. It was necessary to. give defendant an infusion of gluecose saline, a blood transfusion, and % of a grain of morphine, heat, and tetanus antitoxin. Defendant was transferred from the accident room to a regular ward about 2:30 o’clock the next morning.
 

 Defendant was confined to the hospital for some time in a serious condition. When he had sufficiently, recovered, he was removed to the parish prison on a charge of murder. His trial took place in the month of February, 1941, almost a year after the fatal shooting occurred.
 

 After the defendant had closed his case, the State placed on the stand Dr. C. GrenesCole, the coroner of the Parish of Orleans. Over defendant’s objection, Dr. Cole was. shown the record of the Charity Hospital, and certain questions were propounded to him by the district attorney for the purpose of obtaining his professional and expert opinion as to defendant’s physical and mental condition based on his examination of the hospital report. Dr. Cole testified in substance that in his opinion the report did not indicate that defendant was in a state of unconsciousness and did not know what he was' doing or saying. Dr. Cole stated, in answer to a question, he did not know when the treatment set forth in the
 
 *886
 
 report was given, but that as it was given in the accident room, he judged it immediately followed defendant’s admission into the room. Dr. Cole admitted that defendant’s wound, which was just below the heart, was a serious wound, although he stated that' persons frequently recover from such wounds. He admitted further that the record showed defendant was in a state of shock and that he had lost considerable blood. In response to questions, he .stated that morphine was administered principally for the relief of pain; that while generally it ran true to form, it .sometimes affected persons differently, and that in some patients it brought on a condition of drowsiness.
 

 The bill of exception sets forth ■that the objection urged by counsel for defendant to the testimony of Dr. Cole was that it was not rebuttal evidence, and that Dr. Cole, not having seen or examined defendant, was not in a position to testify concerning his true mental and physical ■condition. According to the per curiam, the only objection urged by defendant to the testimony of Dr. Cole was that he was present in the courtroom during the defendant’s trial, in violation of the court’s order that the witnesses be segregated. The testimony of Dr. Cole was not admissible in rebuttal to show that the alleged confession of defendant was freely and voluntarily made. .The court had already ruled •adversely to defendant’s contention in that respect and the confession had been re•ceived by the jury.
 

 In support of the motion for a new trial, defendant placed on the stand Dr. Clarence P. May, an expert in nervous and mental diseases. Dr. May who, on many occasions, has been appointed on lunacy commissions by trial judges in criminal prosecutions, was asked to interpret the hospital record. He expressed' surprise that a person in defendant’s condition, as shown by the record, was allowed to talk at all. He further stated that he would suspect that the mental functioning of a person suffering from shock as described in the report was definitely impaired.
 

 Dr. May was asked the following questions as to whether any credence could be given to a statement made by a person suffering from shock such as described in the hospital report, to which he gave the following answers, to-wit:
 

 “Q. Therefore, you would not give it (the statement) much credence; there would be something there that would tend to make you feel that the man did not know what he was talking about ? A. That he may not have known.
 

 “Q. There is a doubt there? A. Yes, sir.
 

 "Q. He may not have known; that is exactly what we are driving at? A. Yes sir. He may have been so affected by the shock that he may not have realized what he was saying or doing.”
 

 It is not clear from the record when the treatment referred to in the hospital report was administered. It is certain, how
 
 *888
 
 ever, that it began as soon as defendant was brought to the accident room. At the time Detective Schwehm saw defendant he was lying on the operating table in the accident room of the hospital. According to the witness, when he entered the room defendant was very boisterous, cursing the doctors, rolling around, and .refusing to receive treatment. The doctors were in and out of the room. They asked the witness to see if he could pacify defendant, who addressed the witness, as well as the doctors, as “sailor.” The witness testified that he was finally able to pacify defendant, after which he spoke to defendant for some ten or fifteen minutes.
 

 Defendant was a witness on the trial of the case. He testified in substance that after calling for help he kissed the deceased, placed her on the floor, and then shot himself. He felt himself getting dizzy and tried to stand on his feet, but must have fallen to the floor. He did not remember anything after that until he awoke in the hospital some time during the early daylight of Monday or Tuesday. He was not acquainted with Detective Schwehm and, as far as he knew, had never seen him until he took the stand as a witness for the State. Defendant stated he was not in a position to deny or admit that he spoke to Detective Schwehm.
 

 The theory of the prosecution was that defendant and deceased were living together as husband and wife and that defendant murdered the deceased in order to terminate the relationship. On the other hand, defendant’s contention was that defendant was worried because of the loss of his money and the lack of work and he became so depressed he attempted to commit suicide, and that deceased was accidentally shot and killed when she attempted to prevent him from doing so. In these circumstances, it can not be doubted that the confession of the defendant, if a jury believed it to be true, and they obviously did so, was highly prejudicial to the defendant.
 

 Section 11, Article 1 of the Constitution of 1921, provides that “no person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made.” The constitutional provision also appears in Articles 451 and 452 of the Code of Criminal Procedure. Article 452 is a verbatim restatement of the first part of the provision. Article 451 is a substantial reproduction of the latter part of the constitutional provision. Article 451 reads as follows: “Before what purposes to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.”
 

 The question presented in this case is whether defendant’s confession was freely and voluntarily made. In order to determine the question, the facts and circumstances surrounding and entering into the making of the confession should be
 
 *890
 
 considered. The question is not to be determined by the mere conclusions or statements of the police or other officers that the confession was made freely and voluntarily. State v. Newton, 173 La. 382, 137 So. 69.
 

 Whether the confession was true or not does not enter into the consideration of the question. The rule is that no matter how true a confession may be, if it was not freely or voluntarily made, it is not admissible in evidence. State v. Scarbrough, 167 La. 484, 119 So. 523.
 

 “A confession may be involuntary and yet be true. The courts, however, exclude involuntary confessions as evidence without regard to their truth, and in doing so they proceed not so much upon the ground of the unreliability of the confession as upon a humanitarian ground. The rule is a manifestation of a spirit, of fairness toward the accused which is different from the reason usually given that experience has shown that statements made under compulsions are likely to be untrue.” 20 Am. Jur., Evidence, § 483, p. 422.
 

 It is not enough that the confession was not induced by a promise or a threat in order to prove that it was voluntarily made. It is voluntary in law if, and only if, it is voluntary in fact. State v. Henry, 196 La. 217, 198 So. 910.
 

 Under the facts presented by this record we are constrained to hold that defendant’s confession was not freely and voluntarily made. The situation of the defendant, the nature of his wound, the condition of acute shock from which he was suffering, his weakness resulting from the loss of blood, and the effect of the morphine and other treatment that was administered, or being administered to him, necessarily, overthrows any possible implication that his statement to Detective Schwehm in response to the detective’s questions could have been the result of a purely voluntary mental action.
 

 Apart from the conflicting interpretations placed upon the hospital record by Dr. Cole and Dr. May, if their testimony can be considered, reason and common sense indicates that the state of mind of one situated as the defendant was when the confession was made is not such as to induce the belief that his statements were free and voluntary. In any event, under the circumstances disclosed by the record, there is a reasonable doubt as to whether defendant’s confession was freely and voluntarily made. This being so,' the doubt must be resolved in favor of the defendant, thereby forcing the further conclusion that the trial judge erred in admitting his confession over the objection of defendant’s counsel.
 

 It is not necessary to dispose of the remaining bills contained in the record. The circumstances recited in the bills are not likely to recur on another trial of the case. Bill No. 11 was reserved to the action of the trial judge in refusing to permit the defendant to recall certain state witnesses for cross-examination before the
 
 *892
 
 state closed its case. Bill No. 12 was reserved to the ruling of the trial judge permitting Dr. Cole, the coroner, to testify in rebuttal. Bill No. 13 was reserved to the action of the trial judge overruling the objection of defendant’s counsel to certain remarks made by the assistant district attorney in his argument to the jury. Bills Nos. 14 and 15 were reserved to the action of the trial judge in refusing, under a motion for a new trial, to hear further testimony by Robert Cashe and Mrs. Ruby Gardner, who had testified on behalf of the state. Bill No. 16 was reserved to the overruling of the defendant’s motion in arrest of judgment. Two contentions were presented by the motion; first, that defendant could not be sentenced to hang, because Act No. 14 of 1940 repealed articles 569 and 570 of the Code of Criminal Procedure, prescribing hanging as the method of execution, and, second, that defendant could not be sentenced to be electrocuted, because the crime charged was committed prior to the effective date of Act No. 14 of 1940, prescribing electrocution as the method of execution, which could not be applied so as to make its provisions retroactive. The issue raised .by this bill was disposed of adversely to defendant’s contentions in the case of State ex rel. Pierre v. Jones, 200 La. 808, 9 So. 2d 42.
 

 For the reasons assigned, the defendant’s ■conviction and sentence are annulled, and the case is remanded to the district court for a new trial.
 

 ODOM, J., absent.