[No. B186098. Second Dist., Div. Seven. Feb. 7, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
GERSON ELIU PERDOMO, Defendant and Appellant.

606

## Counsel

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc E. Turchin and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**JOHNSON, J.**—Appellant Gerson Eliu Perdomo was involved in a single-car accident which resulted in the death of one of his passengers and very serious injuries to himself and to another passenger. A jury convicted appellant of felony vehicular manslaughter while intoxicated,[1] of driving while under the influence of alcohol resulting in bodily injury to a person other than the driver,[2] and of driving with a blood-alcohol level of .08 percent or greater resulting in bodily injury to a person other than the driver.[3] He claims it was error of constitutional dimension to admit statements he made to officers who interrogated him in the intensive care unit of the hospital while he was recovering from surgery and heavily sedated with narcotic pain medications. He claims his statements were involuntary, not the product of his free will, and thus their admission violated his Fifth and Fourteenth Amendment rights to a fair trial. We find no error. Accordingly, we affirm.

---

[1] Penal Code section 191.5, subdivision (a).

[2] Vehicle Code section 23153, subdivision (a).

[3] Vehicle Code section 23153, subdivision (b).

## FACTS AND PROCEEDINGS BELOW

Appellant, Marco Quinonez and Ismael Rodriguez all worked as security guards at Universal Studios. On Friday, August 22, 2003, the three men decided to go out to celebrate appellant's 21st birthday. They borrowed Quinonez's mother and brother-in-law's car, a Honda Civic. The men left from appellant's house and appellant drove the Honda with Quinonez's mother's permission. Appellant had driven the car on prior occasions since Quinonez had suffered a driving under the influence (DUI) conviction and had lost his driver's license. Quinonez was still on probation as a result of the conviction.

The three men went to a bar and club in Simi Valley called Arena Sport. They apparently stayed there several hours and consumed numerous alcoholic beverages.

Around 2:45 a.m. on August 23, 2003, the Honda was traveling eastbound on the 101 Freeway at approximately 80 miles an hour when it crashed into and nearly went over the concrete center median. The impact into the concrete barrier blew out the car's left tires. The metal wheels made sparks and left scrape marks on the road as the car careened back across the freeway lanes. The left side of the car smashed into a tree on the right shoulder of the road and came to rest.

Ruperto Ramirez witnessed much of the accident as he drove eastbound on the 101 Freeway around 2:45 a.m. Ramirez was traveling around 90 miles per hour when he came upon a Honda Civic driving erratically at approximately 80 miles per hour. Ramirez slowed down to avoid the car. When he felt it was safe to do so, Ramirez sped up and drove around the Honda Civic. When he looked in his rearview mirror he saw sparks coming from underneath the Honda. He then saw the Honda's headlights disappear, reappear, and disappear again. Ramirez got off the freeway, returned and drove to the accident scene.

He saw the Honda smashed up against a tree. He took a flashlight, looked into the passenger side of the Honda and saw three people in the car. They were all covered in blood. The driver was slumped motionless over the steering wheel. The person in the backseat was lying motionless over the front seat. The person in the passenger seat was moaning.

Ramirez called the police. As he was doing so an ambulance happened to come down the freeway and stopped to assist. Fire department personnel and another ambulance arrived shortly after. A California Highway Patrol officer

arrived later. Ramirez watched as fire department personnel opened the car door to remove the front passenger and place him in an ambulance.

Ramirez provided the California Highway Patrol officer with the necessary information for the officer's incident report and went home.

California Highway Patrol Officer Laubscher received the emergency call and arrived at the scene sometime after 3:00 a.m. He saw a vehicle with its left side up against a tree on the side of the freeway. Fire department personnel had just removed the right front passenger from the car and were then in the process of removing the passenger from the backseat.[4] Other fire department personnel were cutting off the roof of the car in order to remove the driver from where he was pinned in the car by the tree and the steering wheel.

According to the officer it took nearly 20 minutes to cut off the roof of the car and to extricate the driver from the car.

The officer testified he identified the front passenger as Marco Quinonez from a California identification card Quinonez had on his person.[5] Quinonez had a huge gash on the left side of his head, which was bleeding profusely. Quinonez had suffered brain damage, damage to the left side of his face and a broken left wrist. Officer Laubscher could distinguish Quinonez from the driver because Quinonez was a large man with a round face, and the only person with a huge head wound. The driver, on the other hand, was thin, had a narrow face, a closely shaved head and no head wound.

The officer testified once the driver was extracted from the car and placed on a gurney he reached into the driver's pants pocket and took out his wallet. According to the officer, the wallet contained appellant's driver's license. The photo on the driver's license resembled the driver because it similarly depicted a young man who was thin and had a narrow face. The officer testified the driver had facial cuts and was bloody and unconscious, but, as

---

[4] At the preliminary hearing the officer instead testified the right front passenger was outside the car, walking around the trees moaning and holding his head. He also testified at the preliminary hearing the backseat passenger, Rodriguez, was lying on a sheet on the right side of the road where emergency personnel were performing cardiopulmonary resuscitation on him.

Officer Laubscher explained he had made numerous mistakes in his testimony at the preliminary hearing because he had only had two to three hours of sleep the night before the hearing.

[5] Apparently, Quinonez had neither a driver's license nor a California identification card, and instead used a passport for identification.

distinguished from the front passenger, he did not have a large gash in his head.

The backseat passenger, Ismael Rodriguez, was pronounced dead on arrival at a nearby hospital. He died from blunt force trauma to his head. Quinonez and appellant were airlifted to UCLA Medical Center for treatment.

Officer Laubscher was also an experienced auto mechanic and he examined the Honda at the impound lot. He detected no mechanical flaw or other mechanical explanation for the accident. He found a small amount of marijuana under the passenger seat.

Officer Laubscher also conducted an investigation of the accident scene. From skid and friction marks on the road he determined the car was traveling between 80 and 85 miles an hour. He opined the driver lost control of the car, struck the center divider and ruptured the left side tires. The driver then corrected to the right, came across the lanes and struck the tree. From information he downloaded from a weather Web site, the officer determined at the time of the accident the temperature was 65 degrees and it was clear. The roadway was dry and the traffic was light at that hour. Given these conditions, the officer gave his opinion the cause of the accident was driving while under the influence, and at excessive speeds while making unsafe maneuvers.

Appellant suffered severe traumatic injuries to his chest area. Several of his ribs were fractured. He underwent emergency surgery at UCLA Medical Center to remove his spleen. He had some bleeding in his brain as well.

Medical personnel at the hospital drew a sample of appellant's blood at 4:00 a.m. The analysis at 4:19 a.m. showed appellant had a blood-alcohol level of .221 percent at 4:00 a.m. An analysis of appellant's urine showed the presence of both alcohol and marijuana.

A forensic alcohol expert considered the data appellant was five feet six inches tall, weighed 120 pounds, and measured a blood-alcohol level of .221 percent at 4:00 a.m. The expert opined that at the time of the accident at 2:45 a.m. appellant would have been under the influence of alcohol, mentally and physically impaired, and incapable of operating a motor vehicle safely.

Quinonez testified at trial. He said he, Rodriguez and appellant worked together at Universal Studios security. They decided to go out to a club to celebrate appellant's 21st birthday on August 22, 2003. He borrowed his

mother's car and appellant drove it to the club. Appellant often drove Quinonez's car since Quinonez no longer drove after losing his license because of a DUI conviction.[6] Quinonez remembered being in the club and remembered drinking heavily. However, he had no memory of leaving the club and had no memory of the accident at all. Quinonez only remembered waking up several days later at his home after his release from the hospital.

Quinonez identified photos officers took of his head wound a few days after he was released from the hospital. The photos showed a large wound on the left side of his head closed by staples and stitches. He suffered serious brain damage from the accident. Quinonez suffered further brain injury a few months before the trial when someone hit him in the head during a robbery.

Quinonez's mother testified she gave permission for appellant to drive her car that evening because he was the only one with a driver's license. She testified appellant had driven her car on numerous prior occasions, and especially since her son had lost his driver's license.

While Quinonez and appellant were still in the hospital, UCLA Medical Center personnel gave Quinonez's mother a bag they said contained her son's personal effects. Quinonez's and appellant's personal belongings had obviously been mixed together. The bag contained Quinonez's necklace and earrings. However, it also contained jewelry and clothing Quinonez's mother did not recognize. Quinonez's mother searched through the bag for her son's passport and did not find it. Appellant's mother, who was also in the waiting room of the hospital, identified the other jewelry in the bag as belonging to appellant. Medical records indicated Quinonez's personal effects at the hospital included a driver's license and a California identification card.

Four days after the accident and appellant's surgery, medical personnel in the intensive care unit of UCLA Medical Center finally granted Officer Laubscher and his partner Officer Jensen permission to speak to appellant. Medical personnel directed the officers to keep their discussion brief. Around 6:30 a.m. the officers interviewed appellant in the intensive care unit of the hospital. The interview was tape-recorded. The room was filled with several other patients separated by hanging sheets. Hospital staff persons entered and exited the room as they attended to the needs of the other patients. The tape recording is filled with sounds of these persons' movements as well as the

---

[6] At the preliminary hearing, by contrast, Quinonez admitted he still drove, notwithstanding the fact he had no valid driver's license. He testified he drove his mother's car over to appellant's house and then appellant drove the three in Quinonez's car to the club.

sounds of medical monitoring devices. The tape was played for the jury at trial.

Appellant was lying flat on his bed, recovering from the splenectomy, broken ribs and head injury. He was in obvious pain. Appellant had received his last pain medication five and a half hours earlier. He was still connected to intravenous solutions and monitors. He had been on a ventilator since the surgery but this device had been removed the day before and he was breathing on his own. Appellant's speech was slow and deliberate but not slurred or overly raspy from the intubation. The officers' questions were also slow, subdued and deliberate. The interview, with numerous pauses, lasted approximately 20 minutes.

The officers questioned appellant about the events occurring before and after the accident. They asked appellant about his passengers, the name of the security company where they all worked and its telephone number, and whether he had been smoking marijuana the night of the accident. Appellant's answers were responsive to the officers' questions. According to Officer Jensen, who was present and later transcribed the tape, appellant admitted he had been driving the car when the accident occurred.

Appellant testified in his own defense at trial. He stated he had a California driver's license as well as a California identification card.

Appellant stated that on Friday, August 22, 2003, he was standing outside his house with several friends when Rodriguez and Quinonez drove up in their respective cars. They decided to use Quinonez's Honda to drive to the club. Appellant had driven the car on numerous prior occasions and agreed to drive his friends to the club. However, the plan was for him to celebrate his 21st birthday by getting drunk so he insisted one of the others drive home from the club.

He drove to the Arena Sport bar in Simi Valley. He consumed numerous alcoholic beverages and danced. At some point another friend of his, Raymond, warned appellant he was so drunk he should give his jewelry, money, identification and other valuables to his friends so he would not "get rolled." Appellant gave some of his belongings to Quinonez and other valuables to Rodriguez. According to appellant, Rodriguez said Quinonez should carry all of appellant's belongings because Quinonez lived so close by it would be easier for appellant to retrieve his belongings from him the next day. Appellant gave all his valuables to Quinonez and this, he explained, was the reason Quinonez had all his personal belongings, including his driver's license.

Appellant testified he continued to drink until he was nearly falling down drunk. He stated he had no recollection of the accident and had no recollection of speaking to the officers while in the hospital. Appellant testified he did not know whether he drove the Honda home from the club.

An information charged appellant with felony vehicular manslaughter while intoxicated,[7] with driving while under the influence of alcohol resulting in bodily injury to a person other than the driver,[8] and with driving with a blood-alcohol level of .08 percent or greater resulting in bodily injury to a person other than the driver.[9] The jury convicted appellant as charged. In addition to imposing fines and restitution and other orders, the trial court sentenced appellant to a total term of six years in state prison.

## DISCUSSION

The only seriously contested issue at trial was the identity of the driver. Appellant based his defense on the contention Quinonez must have been driving at the time of the accident.

As part of his defense, appellant moved pretrial to exclude the evidence of inculpatory statements he made to the officers in the intensive care unit while recovering from the splenectomy and the other injuries he sustained in the accident. Near the end of the interview appellant admits he sometimes smoked marijuana and then said, "Maybe that day I was smoking. I'm not gonna bullshit you guys. I was driving Marc's car."

The court conducted an evidentiary hearing. At its conclusion, the trial court, in a lengthy and thoughtful analysis of the relevant facts and pertinent authorities, found appellant's statements were voluntary and made of his own free will. Accordingly, the court found his statements admissible.

Appellant contends the court's ruling was error.[10] He asserts his statements were instead the result of his will being overcome by the two officers who

---

[7] Penal Code section 191.5, subdivision (a).

[8] Vehicle Code section 23153, subdivision (a).

[9] Vehicle Code section 23153, subdivision (b). At the People's request the court struck a fourth count alleging illegal possession of marijuana in violation of Health and Safety Code section 11357, subdivision (b).

[10] The trial court found as a matter of fact that (1) the officers discussed whether to give appellant *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) warnings while driving to the hospital; (2) Officer Jensen provided appellant *Miranda* warnings by reading the rights off a card he kept on his person for this purpose; and (3) appellant acknowledged and waived his constitutional rights prior to the interrogation. Appellant does not challenge this aspect of the court's ruling on appeal.

exploited his debilitated physical and mental conditions through psychological coercion. He argues admission of his statements thus violated his Fifth and Fourteenth Amendment rights to a fair trial requiring reversal of his convictions.

I. *GENERAL PRINCIPLES FOR DETERMINING THE VOLUNTARINESS OF A CONFESSION.*

"In reviewing the voluntary character of incriminating statements, ' "[t]his court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' " (*[People v. Hogan* (1982) 31 Cal.3d 815], 835 [183 Cal.Rptr. 817, 647 P.2d 93].)' (*People v. Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].) 'In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873 [45 Cal.Rptr.2d 355].)

■ "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 98 S.Ct. 2408].) The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [9 L.Ed.2d 922, 83 S.Ct. 917].) ' "The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.] In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation.' [Citation.]" [Citation.]' (*People v. Thompson, supra,* 50 Cal.3d at p. 166.)

■ "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. (*People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d

330], citing *Colorado v. Connelly* [(1986)] 479 U.S. [157] at p. 167 [93 L.Ed.2d 473, 107 S.Ct. 515].) A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. (*Benson, supra*, at p. 778.) Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929 P.2d 544].) The statement and the inducement must be causally linked. (*Benson, supra*, at pp. 778–779.)"[11]

In the present case appellant's statements were tape-recorded. Moreover, the facts surrounding the giving of his statement are undisputed. Accordingly, we may, in following these principles, independently review the trial court's finding of voluntariness.[12]

## II. *THE RECORD SUPPORTS THE TRIAL COURT'S FINDING APPELLANT'S STATEMENTS TO THE OFFICERS WERE VOLUNTARY.*

Appellant asserts there are numerous parallels between his case and the factual circumstances of *Mincey v. Arizona*[13] sufficient to find his statements involuntary and require reversal of his convictions.

In *Mincey* police officers conducted a narcotics raid of Mincey's apartment. Shots were fired and one of the undercover officers was shot and killed. Other officers entered Mincey's bedroom and found him lying on the floor wounded and semiconscious. Mincey was transported to the hospital where he received emergency treatment. When he arrived at the hospital he was depressed almost to the point of coma.[14] He had been shot in the hip. The shot caused damage to the sciatic nerve and partial paralysis of his right leg. In the emergency room tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting. A catheter was inserted into his bladder. He received various drugs, and medical personnel attached a device to his arm so he could be fed intravenously. Mincey was then moved from the emergency room into the intensive care unit.[15]

---

[11] *People v. Maury* (2003) 30 Cal.4th 342, 404–405 [133 Cal.Rptr.2d 561, 68 P.3d 1].

[12] *People v. Maury, supra*, 30 Cal.4th 342, 404.

[13] *Mincey v. Arizona, supra*, 437 U.S. 385.

[14] *Mincey v. Arizona, supra*, 437 U.S. 385, 398.

[15] *Mincey v. Arizona, supra*, 437 U.S. 385, 387, 396.

Around 8:00 p.m. a police detective came to the intensive care unit to interrogate Mincey. The detective told Mincey he was under arrest for the murder of the police officer. He gave *Miranda*[16] warnings to Mincey and then started questioning him about the activities and shooting at his apartment. Mincey could not talk because of the tube in his mouth. He responded to the detective's questions by writing answers on pieces of paper. The detective continued to question Mincey until almost midnight.[17] During the interrogation Mincey repeatedly asked for the interrogation to cease. Several times Mincey requested the assistance of counsel before responding.[18] He complained to the detective the pain in his leg was unbearable. Some of Mincey's written responses were incoherent and on their face showed he was confused and unable to think clearly about the events at his apartment or about the interrogation. The detective ceased the interrogation only during the intervals when Mincey lost consciousness or received medical treatment "and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness."[19]

The Supreme Court concluded Mincey's statements were not the product of his free and rational choice. "To the contrary, the undisputed evidence makes clear that Mincey wanted *not* to answer Detective Hust. But Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne. Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial."[20]

Like the situation in *Mincey*, here appellant was questioned while lying in a hospital bed in the intensive care unit. As in *Mincey*, no family members or friends were then with him. He was recovering from surgery for the injuries he received four days earlier. Intravenous tubes were still attached to his body. Appellant had been receiving narcotic pain medications since his admission to the hospital. He received his last dose of pain medication five and a half hours earlier at 1:00 a.m.: two milligrams of morphine, plus two milligrams of Versed, a sedative. According to the interrogating officers, appellant appeared to be in pain and also appeared to still be under the influence of the narcotic pain medication.

---

[16] *Miranda v. Arizona, supra*, 384 U.S. 436.

[17] *Mincey v. Arizona, supra*, 437 U.S. 385, 387, 396.

[18] *Mincey v. Arizona, supra*, 437 U.S. 385, 387, 400.

[19] *Mincey v. Arizona, supra*, 437 U.S. 385, 387, 401.

[20] *Mincey v. Arizona, supra*, 437 U.S. 385, 387, 401–402.

However, this is where the similarities end. Unlike what occurred in *Mincey*, appellant was not interrogated within hours of his injuries, and not interrogated only a few hours after receiving medical treatment. Also unlike in *Mincey*, appellant was not interrogated while going in and out of consciousness. In this case, the officers were not permitted to interview appellant until four days after appellant's surgery. Hospital personnel did not permit the officers to talk to appellant until they determined he was "alert," "oriented," and could "obey[] commands," as indicated by his medical chart. By this time appellant no longer needed the assistance of a respirator and medical personnel had removed it the day before the interview.

On the day of the interview hospital staff determined appellant's condition had improved sufficiently that he could safely be cared for in a regular hospital room. At 8:30 a.m., two hours after the interview, appellant was moved out of the intensive care unit, taken off intravenous pain medications and thereafter given oral doses of Vicodin for pain as needed.

■ The evidence showed appellant was probably still under the influence of the pain medications, although the effect of the morphine he received five and a half hours earlier had likely diminished over the hours. The interviewing officers thought he appeared to be "under the influence." Officer Laubscher testified he would not want appellant to be driving in his condition. The surgeon who performed the splenectomy on appellant was not an expert on the effects of pain medications but opined, based on his general knowledge, the combination of his injuries and medications would adversely affect appellant's ability to think clearly. The fact an interviewee is under the influence of alcohol or drugs is a significant factor. However, it is not, standing alone, a sufficient indicator of involuntariness.[21]

Nothing on the tape shows appellant's thinking was impaired by the medications. Appellant's speech is slow and deliberate, but is not slurred or

---

[21] See, for example, *In re Cameron* (1968) 68 Cal.2d 487, 499–500, 502 [67 Cal.Rptr. 529, 439 P.2d 633] (although the defendant had a blood-alcohol content of .18 percent, a review of the first taped interview showed he effectively resisted the officer's attempt to elicit details of the crime and this was persuasive evidence showing his will to resist was not overborne during this first interview. However, when the alcohol was later combined with an extremely high dose of the tranquillizer Thorazine these substances destroyed his will to resist and to understand the seriousness of his predicament, while making him desirous of pleasing the officers; the statements he made during those later interrogations were not the product of a rational intellect and free will); *People v. Weaver* (2001) 26 Cal.4th 876, 921 [111 Cal.Rptr.2d 2, 29 P.3d 103] (the due process inquiry focuses on the alleged wrongful and coercive actions of the state and not the mental state of the defendant; thus, the mere fact he was taking medication prescribed by the prison medical staff was insufficient to establish a claim of involuntariness).

incoherent. Each of appellant's answers is appropriate to the question asked. In some instances, his answers were remarkably detailed. For example, when asked the name of the security company for which they all worked, appellant stated the name for the officers, spelled out the company name several times, and even recited the company's telephone number.

At the beginning of the tape it appears appellant was even alert enough to attempt to deceive the officers. He initially told the officers the night of the accident he had been driving his mother's Nissan, alone, and without passengers. He later acknowledged being with Rodriguez and Quinonez in Quinonez's mother's Honda.

Most importantly, the interrogation in the present case exhibits none of the coercive police activity found in *Mincey* and other cases finding statements to have been involuntary.[22] The interview in the present case was relatively short. It lasted a maximum of 20 minutes, as compared to the three hours Mincey was forced to endure. The officers in the present case posed their questions in a calm, deliberate manner. The officers' voices on the tape are very quiet and subdued, perhaps in deference to the other patients in the unit, and/or because of the relative lack of privacy in the room. The 20-minute interview includes several pauses as well, as medical personnel enter and exit the room providing treatment for the other patients. Unlike Mincey, who had asked for the interrogation to cease and had refused to answer some questions without the assistance of counsel, appellant made no such requests and did not express distress or otherwise indicate any unwillingness to speak to the officers.

As the trial court noted, the officers' tone was conversational and not threatening. One of the subjects discussed was how supportive and attentive appellant's mother had been. Appellant expressed gratitude for his recovery.

---

[22] *Mincey v. Arizona, supra,* 437 U.S. 385, 401–402 (the coercive police activity included lengthy, relentless questioning, while the defendant was in great pain, in and out of consciousness, while disregarding his requests for the interrogation to cease and for counsel); see also *State v. Graffam* (1943) 202 La. 869 [13 So.2d 249] (statements the defendant made while interrogated lying on a gurney just after being shot, in a state of acute shock and delirium, while hemorrhaging with a dangerously low blood pressure were involuntary); *State v. Vincik* (Iowa 1987) 398 N.W.2d 788 (after major brain and eye surgeries medical personnel released the defendant to the police officers in the belief they would transport the defendant to the psychiatric facility for evaluation. The officers instead took him to the police station and interrogated him for three hours. The defendant's signed statement which he could not see to read was not voluntary but likely the product of the sedatives and other pain medications just administered to him for a followup surgery just before the interrogation).

He asked the officers questions regarding his friends' conditions. At the end of the tape the officers wish appellant good luck and a speedy recovery.

In short, the record is devoid of any suggestion the officers resorted to physical or psychological pressure to elicit statements from appellant.[23] Absent some indication of coercive police activity, an admission or confession cannot be deemed involuntary within the due process clause of the Fourteenth Amendment.[24]

In the event the trial court erred in finding appellant's statements voluntary we would nevertheless find their erroneous admission into evidence harmless beyond a reasonable doubt.[25] Appellant's taped statement was not the only evidence he was driving when the accident occurred. Officer Laubscher testified without contradiction the right front passenger was a large man, with a round face, who had received a huge head wound in the accident. By contrast, Officer Laubscher testified, the driver of the Honda was slight of build, had a narrow face and no head wound. The officer explained how he watched the fire department personnel cut open the roof of the car and extract the driver from where he had been pinned against the tree and steering wheel. The officer further testified the driver's wallet contained appellant's driver's license and the photo on the license matched appellant's and the driver's physical characteristics.

The jury learned appellant's primary wounds were to his chest area from likely contact with the steering wheel. He had broken ribs and a damaged spleen which required emergency surgery to remove. The jury members had the opportunity to observe both appellant and Quinonez. They could thus decide for themselves whether the officer's descriptions were accurate based on the men's respective physical features and wounds sustained in the accident. This physical and testimonial evidence was sufficient in itself to establish appellant had been the driver even without his statement he had been driving the car when the accident occurred. Thus, any error in admission of this evidence would surely be harmless beyond a reasonable doubt.

---

[23] *People v. Whitson* (1998) 17 Cal.4th 229, 248–249 [70 Cal.Rptr.2d 321, 949 P.2d 18] (indicators of physical or psychological pressures include improper interrogations tactics, lengthy questioning, trickery, deceit, or improper promises).

[24] *Colorado v. Connelly, supra*, 479 U.S. at page 167.

[25] *People v. Neal* (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280] (error in admitting statements found to be involuntary is reviewed under the standard for prejudice of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], citing *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246]).

## DISPOSITION

The judgment is affirmed.

Perluss, P. J., and Zelon, J., concurred.