Filed 10/27/15  P. v. Yang CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SENG YANG,<br><br>    Defendant and Appellant. | F067353<br><br>(Super. Ct. No. F11907074)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Manuel J. Baglanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Seng Yang of assault on a peace officer with a semiautomatic firearm (Pen. Code, § 245, subd. (d)(2);[1] count 1) after he had an encounter with two police officers while holding a handgun. The jury found true two firearm allegations associated with that count (§§ 12022.53, subd. (b), 12022.5, subd. (a)). Appellant was also convicted of assault on a peace officer with a deadly weapon other than a firearm (§ 245, subd. (c); count 2) after he discarded his gun and ran at the lead officer while brandishing a knife. The two officers shot appellant multiple times, resulting in his hospitalization. Appellant was sentenced to an aggregate prison term of 16 years four months.

Appellant raises four issues on appeal, which we address in chronological order of events. First, he contends the trial court erred when it denied his pretrial motion pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and its progeny to suppress recorded statements he made to a detective while hospitalized. His statements suggested he attempted to shoot his gun during the encounter. He seeks reversal of count 1.

Second, he asserts the trial court erred when it directed the jury to resume deliberations after it announced it was unable to reach a verdict on count 1, although it had reached a verdict on count 2. After continuing deliberations the jury listened to appellant's interview with the detective and shortly thereafter reached a verdict on count 1, which he contends should be reversed.

Third, he argues there is not substantial evidence to support his conviction of count 1 for assault with a firearm upon a peace officer. Finally, he maintains the cumulative effect of the alleged errors rendered his trial fundamentally unfair, requiring reversal of the entire judgment. Appellant's arguments are without merit. We affirm.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

# FACTUAL BACKGROUND

Appellant did not offer any evidence at trial. The prosecution's case is summarized below.

## I.      Appellant's Encounter with Law Enforcement.

Shortly after midnight on December 12, 2011, Fresno Police Department Officers Bernard Finley and Sergio Gonzalez were dispatched to appellant's residence for a reported "family disturbance" involving a male subject. Both officers arrived in separate marked patrol vehicles wearing police uniforms.

In response to Finley's knocking, an older woman opened the front door and an outer screened security door. The woman appeared frightened. After opening the door and security gate she immediately walked back towards the end of the hallway and got out of the way without saying anything. Finley could see into the house and saw appellant at the end of a hallway inside a bedroom. Although it was dark outside and the hallway was dark, appellant's room was well lit so Finley had a clear view of him. Finley remained standing at the open front doorway.

Appellant stood approximately three to four feet inside the bedroom but was visible through the bedroom doorway. Finley could not see appellant's right arm or hand. Appellant acted "fidgety" and appeared nervous. Finley ordered appellant to show his hands and to come out of the bedroom. Appellant asked Finley to come inside.

Finley continued to order appellant to show his hands and appellant continued to tell Finley to come inside. Finley drew his service weapon but did not aim it at appellant, holding it in front of his stomach pointed downwards. Finley thought appellant might have mental problems or was under the influence of something

Finley continued to order appellant to show his hands. Appellant continued to make "fidgety movements" and, as appellant moved to his left, Finley saw a black semiautomatic handgun in appellant's right hand. Appellant's gun was pointed downwards and Finley could not see if appellant's finger was on the trigger. Finley

3.

alerted Gonzalez about the gun, and Finley raised his weapon and aimed it at appellant. Finley ordered appellant to put down the gun, which appellant did not do. Appellant continued to tell Finley to come inside. At some point, appellant said he had more guns. Finley described appellant as appearing "really agitated, refusing to put the gun down." Finley heard appellant say, "Shoot me. Shoot me." Finley was concerned that appellant "wanted to commit suicide by cop."

Gonzalez had remained outside the residence and stood to the left of Finley in a position where he could not see appellant. Gonzalez heard appellant say he had guns and "Don't shoot me." He heard Finley order appellant to drop his gun and come out, but appellant told Finley to come inside. Gonzalez described appellant as not responding to Finley's commands.

Appellant's younger brother and sister were inside the house in their respective bedrooms during this encounter. Appellant's brother heard officers at the front door identify themselves and a few moments later appellant was told more than once to drop whatever he held in his hands. He heard appellant tell the officers "at least five times" to shoot him in the head or something similar. He did not hear appellant yell anything else to the officers.

Appellant's sister heard her mother open the front door around midnight and she heard the police officers identify themselves. She heard the officers loudly tell appellant more than once to come outside and put his gun down. She heard appellant say more than once that he wanted the officers to shoot him in the head.

Because appellant was not complying and the situation seemed serious, Finley decided to give a "warning shot" to get appellant's attention. Finley told Gonzalez his plan, asked Gonzalez to back up, and he fired a single shot downwards into a flower bed that was next to the front door. After firing, Finley looked at appellant, who did not react. Finley resumed ordering him to put down his gun, and he noticed appellant was

4.

starting to breathe very heavily and appeared more agitated. Finley believed the situation was escalating and becoming lethal.

Finley continued to order appellant to put his gun down. Appellant began walking towards the bedroom door, towards Finley, and appellant simultaneously raised his gun arm. Finley could not see the barrel of appellant's weapon. Based on the movement of appellant's right arm, Finley assumed the barrel of appellant's gun was raising up in his direction and appellant might use his gun. Finley fired his weapon once or twice as appellant exited the bedroom and turned towards appellant's right (Finley's left). Finley lost sight of appellant, although he could hear appellant moaning as if he had been shot. Finley and Gonzalez backed away from the front door.

As the officers backed away, Gonzalez saw appellant run across the hallway and Gonzalez believed appellant was still armed. Gonzalez fired once at appellant. Finley thought he heard a shot originating from inside the house. He told Gonzalez they should back up even more and they took positions away from the residence. Finley then became concerned appellant posed a threat to the remaining family members inside the house so he went back towards the front door. As he moved forward, Finley heard from inside the house "Wait, wait, wait," or "Here you go," or "Here it comes." Finley believed it was appellant's voice. A gun was tossed out of the house through the front door.

Finley got to the front door, looked and saw appellant at the back of the hallway inside the same room. Appellant's back was facing him. Finely ordered appellant to show his hands and appellant immediately turned holding a knife. Appellant started yelling "a war cry" and ran straight towards Finley, who retreated away from the front door in the direction of Gonzalez, who had remained behind. Appellant exited the residence still yelling and carrying the knife. Finley and Gonzalez fired their weapons multiple times at appellant, who stopped running, dropped the knife and fell to the ground.

5.

As appellant was lying on the ground, he asked the officers to shoot him and he said he had another gun. Appellant started trying to reach for his waistband. Finley punched appellant two or three times, and Gonzalez secured appellant's hands and handcuffed him. Other officers arrived and appellant's family was ordered out of the house, and the house was secured. Law enforcement administered first aid to appellant, who was transported to a hospital.

## II. The Forensic Evidence.

Appellant's knife had an approximate seven-inch blade. Appellant's handgun, a .40-caliber Glock, had eight live cartridges loaded in the magazine but no cartridge loaded in the firing chamber. Appellant's Glock had not been fired that night. Subsequent testing established the Glock was capable of being fired and functioned properly. No other firearms were located at the scene.

Finley fired nine shots that night, and Gonzalez fired 10 shots. Appellant was struck multiple times.

## III. Appellant's Statements While Hospitalized.

Fresno Police Detective Mark Anthony Yee interviewed appellant in the hospital 11 days after the shooting. The interview was recorded and played for the jury. A more detailed summary of this interview is set forth below in part I.A. of the Discussion.

During the interview, appellant stated his initial two shots that night were "blanks." He indicated he threw his gun down on the ground after shooting the blanks because "I can't do nothing with this." Yee asked if appellant thought he fired two times that night "but they were blanks" and appellant answered, "Maybe two or three, I don't know, but it was blank for sure."

Yee testified at trial that he knew appellant's Glock had not been fired that night. Although the Glock's magazine was loaded, the gun's slide had not been manipulated to load a cartridge into the firing chamber. As a result, the Glock was mechanically incapable of firing even if the trigger had been pulled. Yee thought appellant's statement

6.

indicated appellant pulled the Glock's trigger two or three times that night but nothing happened.

## DISCUSSION

**I.     The Trial Court Did Not Err in Denying Appellant's Motion to Suppress.**

**A.     Background.**

Prior to trial, appellant sought to suppress his statements to Yee pursuant to *Miranda*. A hearing pursuant to Evidence Code section 402 occurred. Below is a relevant summary of Yee's testimony from that hearing.

Yee met with appellant in the intensive care unit at a local hospital 11 days after the shooting. Another officer, Claiborne, was present. A police officer had been at appellant's side at all times in the hospital because appellant was in custody. No other patients or medical personnel were present during Yee's interview.

Until the day of the interview appellant had been unable to speak due to his medical condition. Yee would routinely check each day on appellant's status, speaking with the officer assigned that day to watch him. On the day of the interview, Claiborne informed Yee that hospital personnel had removed some type of "tubing or some kind of medical apparatus" from appellant, which enabled him to speak.

Appellant's room was in a locked and secured facility, and Yee had to announce his presence and the reason for his visit before he was buzzed in. Yee did not talk to medical personnel regarding his condition before the interview. Appellant had bandages on his abdomen, legs and arms when Yee spoke with him. Yee knew appellant had undergone surgery but he did not know when that had occurred. Appellant was attached to intravenous and monitoring devices. Yee was not aware if appellant was hooked to a catheter, and he did not know if appellant had received any medications.

Yee woke appellant, who had been asleep when Yee walked into his room. Yee introduced himself as a detective with the Fresno Police Department, and said he was there to talk about the incident from the night appellant was shot. Appellant was just

7.

waking up and appeared groggy. He cleared his throat often as if he had been coughing. Appellant did not verbally respond but he looked at Yee, nodded his head and made facial expressions that indicated he was hearing. Yee confirmed appellant's name and appellant nodded in response. During the interview, Claiborne wore a full police uniform and remained seated in a chair next to the bed in which appellant was lying. Yee wore a shirt and tie.

Yee stood next to appellant, who was propped up in a seated position. Yee testified he believed appellant understood everything that was asked, his answers were consistent, coherent, and relevant to the incident, and appellant was alert throughout the entire conversation. Based on his training and experience, Yee did not believe appellant was under the influence of any narcotics, but he agreed he would not have allowed appellant to drive based on his injuries. Yee indicated appellant closed his eyes at times during the interview but he did not believe appellant was losing consciousness.

The prosecution played the recording for the court and it was moved into evidence. Below is a summary of appellant's recorded statements.

### 1. Appellant's recorded interview.

Yee read the warnings pursuant to *Miranda* and asked appellant if he understood each right. Yee indicated on the recording that appellant was nodding. Yee asked appellant if he wanted to talk and appellant said, "Uh, just ask me." When Yee said, "Huh?" appellant stated, "Just ask what you want to find out." Yee asked if appellant recalled the night he was shot. The following exchange occurred.

> "[Appellant]: I remember.
>
> "[Yee]: Okay, … can you tell me what happened?
>
> "[Appellant]: Nothing happened. I told you. I went and bought the gun.
>
> "[Yee]: You bought … a gun?

8.

"[Appellant]:  That day.

"[Yee]:  That same day?

"[Appellant]:  Same day.

"[Yee]:  Oh, okay.  Why did you buy that gun for?

"[Appellant]:  For my own protection.

"[Yee]:  Oh, okay.

"[Appellant]:  From Halloween.

"[Yee]:  Okay.

"[Appellant]:  I was thinking Halloween.

"[Yee]:  Okay.  And then so after you bought the gun what happened?

"[Appellant]: I bought the gun - - I bought - -

"[Yee]:  Do you remember the police coming to your house?

"[Appellant]:  I forgot what day, okay.

"[Yee]:  Okay.

"[Appellant]:  And then, uh, - - and then, um, um, - -

"[Yee]:  Do you remember when you were … shot?

"[Appellant]: Uh, … I bought that gun."

Appellant then said his brother told him to run and get away from the door, but appellant did not understand what his brother meant.  Appellant then "saw a black police officer" at the corner of the door, which scared appellant because the officer could have shot him, his little brother or his mother.  Appellant said he backed up and indicated he would "throw the gun out."  The officer indicated he was "coming in."  Appellant said he was shot without doing anything and "then I went and ran out, and he was at the door, and my first two shot [*sic*] was blanks."  Appellant threw the gun on the ground because

9.

"I can't do nothing with this." Appellant then retrieved a knife, which was on his bed, and he threw his gun out. He ran outside, upset that the officers were shooting him even though he had not done anything. The two officers shot him.

Appellant indicated he did not know why the police were at his residence that night. He denied telling family members he wanted to hurt himself.

Yee asked if appellant thought he fired two times but they were blanks. Appellant answered, "Maybe two or three, I don't know, but it was blank for sure." Appellant confirmed his gun was a Glock, he used .40-caliber ammunition, and he bought the Glock legally from a gun dealer. Appellant denied wanting to hurt anybody on the night of the shooting.

Yee concluded the interview at 11:05 a.m. The recording lasts 11 minutes and 51 seconds.[2]

### 2. Cross-examination regarding "Halloween" and firing "blanks."

On cross-examination, Yee testified that even though the shooting occurred in December he was not concerned when appellant said he purchased the gun on the same day as the incident. Based on his investigation before the interview, Yee knew appellant had purchased his gun around Halloween in October of 2011. Yee believed appellant was mistaken when he purchased the gun and he did not find it odd that appellant said he needed to buy a gun for protection "from Halloween."

---

[2] In a footnote, appellant contends the recording may have been edited to eliminate pauses based on "the many clicks and similar sounds" appearing therein. Although appellant does not claim that his or Yee's words were altered in any way, he asserts the recording "may not necessarily accurately reflect [his] lapsing in and out of consciousness when he closed his eyes." Appellant admits in the same footnote that he did not raise this point below. "Points not raised in the trial court will not be considered on appeal." (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486.) Accordingly, we will not consider the arguments or issues raised in appellant's opening brief at footnote number 16.

Yee was not concerned regarding appellant's comment about firing "blanks" because Yee knew appellant's gun had not been fired on the night of the shooting and it had been loaded with live ammunition.

### 3. The trial court's ruling.

Following arguments from both counsel, the trial court found appellant gave an implied waiver of his *Miranda* rights after he was advised of those rights, nodded in response and then twice told Yee to ask questions. The court found no suggestion appellant had low intelligence or suffered from a mental condition. The court noted that based on Yee's training and experience, Yee did not believe appellant was under the influence of any drugs or narcotics which would impact his ability to give a waiver. No language barrier appeared between Yee and appellant.

The court noted that *People v. Perdomo* (2007) 147 Cal.App.4th 605 (*Perdomo*), which defense counsel had cited, "does not speak in terms of statements being consistent to the questions asked, but rather, to the statements being responsive or appropriate to the questions asked." The court determined that based on the transcript and recording, appellant's statements were consistent such that appellant "knew what he was being asked and provided the answers that he could to the questions that were asked."

The court addressed appellant's "Halloween" reference, finding it interesting appellant's family had allegedly summoned law enforcement to their home on Halloween in 2011. Based on that, the court commented appellant apparently felt he needed protection and bought a gun. The court found that appellant's answer about why he bought a gun was "pretty consistent, pretty responsive, pretty appropriate, given the context."

The court did not find that appellant's speech was slurred. The court noted the interview was deliberate and conversational. Appellant wanted Yee to know he was not a violent person. Based on all of the circumstances, the court denied appellant's motion to

11.

exclude his statements, holding he gave a knowing and intelligent waiver, and he had the capacity to do so.

**B.      Standard of review.**

The prosecution bears the burden of demonstrating the validity of a defendant's waiver of his *Miranda* rights by a preponderance of the evidence.  (*People v. Dykes* (2009) 46 Cal.4th 731, 751; see *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.)  There is a threshold presumption against finding a waiver of *Miranda* rights but the question ultimately is whether a *Miranda* waiver was voluntary, knowing, and intelligent under the totality of the circumstances.  (*People v. Williams* (2010) 49 Cal.4th 405, 425.)  "On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence." (*Ibid*.)

The inquiry regarding whether a defendant has validly waived his rights under *Miranda*, *supra*, 384 U.S. 436, has two distinct dimensions.  (*Moran v. Burbine* (1986) 475 U.S. 412, 421.)  First, the waiver must have been voluntary, which means a free and deliberate choice not based on intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of the rights being waived and the consequences of the decision to do so.  A court may properly conclude *Miranda* rights were validly waived only if the totality of the circumstances shows both an absence of coercion and the requisite level of comprehension.  (*Ibid*.)

**C.      Analysis.**

Appellant contends Yee's actions constituted coercive police conduct because he knew appellant was vulnerable and he exploited appellant's serious medical condition (evidenced by 11 days in the intensive care unit) without first checking with medical personnel.[3]  Appellant asserts Yee woke him up, he was groggy throughout the

---

[3]      In a footnote, appellant provides Internet hyperlinks to support his contention intubation for 11 days establishes he was "very seriously ill" and his extended period of

12.

interrogation, he kept closing his eyes, which he argues shows a loss of "consciousness," his voice was weak, and he was "seriously confused at times" due to responses that were "patently incredible" and contrary to the facts and circumstances. He argues the tone of his voice reflected "great physical discomfort" throughout the interview. He maintains the trial court's findings were not supported by substantial evidence.

Four cases are instructive regarding appellant's contentions.

First, in *Mincey v. Arizona* (1978) 437 U.S. 385 (*Mincey*) the defendant was shot and hospitalized following a police raid of his apartment which left an officer dead. The defendant was treated in the emergency room before being moved to the intensive care unit. Tubes were inserted into his throat and nose, and a catheter was inserted into his bladder. He received various medications and a device was attached so he could be fed intravenously. (*Id.* at p. 396.) Around 8:00 p.m. the same day, a police detective interrogated him in the intensive care unit. The defendant was told he was under arrest, given *Miranda* warnings, and then questioned about the shooting. The defendant could not speak because of the tube in his mouth and he wrote answers on a piece of paper. The questioning continued until almost midnight despite the defendant's repeated requests to stop. The defendant requested the assistance of counsel several times before responding, and he complained of unbearable pain. Some of his written responses were incoherent, showed confusion and an inability to think clearly about the events at his apartment. (*Id*. at pp. 398-399.) The defendant complained several times that he was confused. (*Id.* at pp. 400-401.) The detective stopped the questioning only when the defendant lost consciousness or received medical treatment. (*Id.* at p. 401.)

---

intubation and condition evidences a significant likelihood "he was also heavily sedated." Respondent objects to this material. We will not consider the points raised in appellant's opening brief at footnote number 15 because they are not included in the record from the proceedings below. (*People v. Pearson* (1969) 70 Cal.2d 218, 221, fn. 1; *Hepner v. Franchise Tax Bd., supra,* 52 Cal.App.4th at p. 1486.)

The United States Supreme Court held the defendant's statements were not based on his free and rational choice. (*Mincey, supra,* 437 U.S. at p. 401.) The defendant was unable to escape the questioning given his medical condition and was at the mercy of the detective. (*Id.* at p. 399.) The undisputed evidence showed the defendant did not want to answer the detective's questions. *Mincey* determined the defendant's will was overborne because he was barely conscious, weakened by pain and shock, and isolated from friends, family and counsel. Accordingly, his statements were inadmissible against him at trial. (*Id.* at pp. 401-402.)

Second, in *People v. Whitson* (1998) 17 Cal.4th 229 (*Whitson*) the defendant was convicted of two counts of second degree murder stemming from a motor vehicle accident. Over *Miranda* objections, the prosecution admitted incriminating statements the defendant made to police officers in the course of three interviews. (*Id.* at p. 235.) The first interview occurred with three police officers in a hospital emergency room approximately three hours after the accident. The defendant was read his *Miranda* rights, and he said he understood in a normal and clear voice. The interview lasted approximately 10 minutes and the defendant never requested an attorney or indicated a desire not to speak. The interview was not recorded and the testifying officer said the defendant never indicated he was in considerable pain. (*Id.* at p. 237.) A second police interview occurred later that same day and a final interview occurred nine days after the accident, both in the hospital. The police readvised *Miranda* rights on both occasions. The defendant said he understood and agreed to talk. (*Id.* at pp. 238-239.)

At a pretrial suppression hearing, the defense introduced the following evidence. The defendant's stepfather arrived at the hospital a little more than one hour after the defendant's initial interview with law enforcement. At that time the defendant was in and out of consciousness, took several minutes to recognize the stepfather, the defendant had blood all over him, he appeared to be in great pain, his voice was neither loud nor clear, and his answers to the stepfather were nonresponsive. (*Whitson, supra,* 17 Cal.4th at p.

14.

240.) A clinical psychologist characterized the defendant as having anywhere from mental retardation to borderline intelligence. The surgeon who examined the defendant said the defendant did not remember the accident shortly after his arrival to the hospital. (*Ibid.*) Despite these concerns, the trial court determined the defendant gave valid *Miranda* waivers. The Court of Appeal reversed but the Supreme Court reversed again.

Regarding the voluntariness of the waiver, *Whitson* found nothing in the record to show the police used physical or psychological pressure. To the contrary, the defendant's willingness to speak with the officers was readily apparent. The defendant was not worn down by improper interrogation tactics, lengthy questioning, tricks or deceit, and he was not induced with improper promises. *Whitson* held it was clear the defendant gave a voluntary waiver. (*Whitson, supra,* 17 Cal.4th at pp. 248-249.)

*Whitson* then addressed whether the defendant was aware of his rights and the consequences of waiving. The defendant was advised of his *Miranda* rights at each of the three interviews. On each occasion, the defendant affirmatively told the officers he understood those rights. The defendant did not appear to be under the influence of drugs and his answers were responsive to the questions asked. (*Whitson, supra,* 17 Cal.4th at p. 245.) Although the defendant had been "seriously injured" in the accident, there was "no direct evidence" the defendant's judgment was clouded or impaired by pain, medications, or surgical procedures. (*Id.* at p. 249.) *Whitson* acknowledged questions existed regarding the defendant's condition when he was first interviewed by police, but the record supported the trial court's determination the defendant was aware of his rights and knowingly waived them. (*Ibid.*) Although the defendant possessed relatively low intelligence, he had sufficient intelligence to pass a driver's test and he initially gave false information to the police to deceive them. The defendant had been advised of his *Miranda* rights during an earlier encounter with police approximately six months before. The Supreme Court determined there was no evidence the defendant lacked sufficient

15.

intelligence to understand his *Miranda* rights or the consequence of his waivers. Therefore, the trial court's ruling was upheld. (*Id.* at p. 250.)

Third, in *People v. Panah* (2005) 35 Cal.4th 395 (*Panah*), the defendant murdered an eight-year-old girl. (*Id.* at p. 408.) When the defendant was apprehended he had slashed wrists, appeared under the influence of drugs or alcohol, and was uttering nonsensical statements about the victim. The defendant was transported to a hospital for medical treatment and the treating physician testified he found the defendant agitated and delusional. (*Id.* at p. 416.) The defendant was having auditory hallucinations, acting inappropriately, and the slashes on his wrists appeared to have been self-inflicted. The treating physician concluded the defendant was suicidal, acutely psychotic, and hearing "'command hallucinations'" (*ibid.*) from figures telling the defendant to kill himself. The physician noted the defendant was under the influence of drugs and could not determine whether the psychosis was a result of the drugs or other factors. (*Ibid.*) At the hospital, a detective interviewed the defendant after advising him of his *Miranda* rights, which the defendant waived. (*Id.* at p. 470.) The trial court found the questioning at the hospital permissible under *Miranda*, concluding the defendant's medical and psychological condition did not render his waiver involuntary. (*Id.* at pp. 470-471.)

On appeal, the defendant argued, in part, he was suffering from acute psychosis, was under the influence of drugs, and was suffering from the effects of a suicide attempt when he was admitted into the hospital. The defendant asserted some of his answers to the detective were irrational. (*Panah, supra,* 35 Cal.4th at p. 472.) The Supreme Court, however, rejected the defendant's claims, noting the detective testified the defendant was "responsive" to the questioning even though the defendant was sometimes irrational during the hospital interrogation. (*Ibid.*) *Panah* found no police coercion involved in the questioning. As a result, it concluded the defendant's statements were not involuntary.

Finally, in *Perdomo, supra,* 147 Cal.App.4th 605, two law enforcement officers interviewed the defendant in the intensive care unit at UCLA Medical Center. The

16.

interview was recorded and occurred four days after the defendant was involved in a vehicle accident that eventually led to his conviction of felony vehicular manslaughter while intoxicated. (*Id.* at pp. 607, 611.) Prior to the interview, the officers received permission from medical personnel to speak with the defendant. The defendant was lying flat on his bed recovering from a splenectomy, broken ribs and a head injury. He was in obvious pain and had received his last pain medication five and a half hours earlier. During the interview he was connected to intravenous solutions and monitors. The defendant had been connected to a ventilator since the surgery but that device had been removed the day before the interview with law enforcement. The defendant's speech was slow and deliberate, but it was not slurred or raspy following intubation. The interview lasted approximately 20 minutes, including numerous pauses. The officers asked questions in a slow, subdued and deliberate manner about the events occurring before and after the accident. The defendant's answers were responsive to the questions asked. (*Id.* at pp. 611-612.) The trial court determined his statements were admissible against him as voluntary and made of his own free will. (*Id.* at p. 613.)

On appeal, the defendant claimed the trial court erred because his will was overborne by officers who exploited his debilitated physical and mental conditions through psychological coercion. (*Perdomo, supra,* 147 Cal.App.4th at pp. 613-614.) *Perdomo* acknowledged the defendant was likely under the influence of pain medications during the interview. The interviewing officers thought the defendant appeared under the influence of medication, and one officer testified he would not want the defendant to drive in that condition. In addition, the surgeon who performed the splenectomy opined the combination of the defendant's injuries and medications would adversely affect the defendant's ability to think clearly. (*Id.* at p. 617.) Despite these concerns, however, *Perdomo* noted nothing on the tape established impaired thinking by the defendant. Although the defendant's speech was slow and deliberate, it was not slurred or incoherent. The defendant provided answers that were appropriate to the questions

17.

asked. (*Id.* at pp. 617-618.) No coercive police activity occurred, the interview was short, and the officers were conversational and not threatening. Accordingly, *Perdomo* held the defendant's statements could not be deemed involuntary. (*Id.* at p. 619.)

Here, as discussed below, this record demonstrates the prosecution met its burden as to both dimensions based on a preponderance of the evidence standard.

### 1. Appellant's waiver was voluntary.

An express waiver of *Miranda* rights is not required. (*Whitson, supra,* 17 Cal.4th at p. 250.) A defendant's decision to answer questions after indicating an understanding of the *Miranda* rights may support a finding of implied waiver under the totality of the circumstances. (*Id.* at pp. 247-248.)

Here, appellant nodded after each *Miranda* right was read to him and nodded when asked if he understood all of his rights. When asked if he wanted to say what happened, appellant told Yee, "Uh, just ask me" and "Just ask me what you want to find out." At no time did appellant ask to stop the questioning, indicate a desire for an attorney, or seek a break in questioning. Appellant indicated his willingness to speak with Yee and his actions throughout the entire interview establish an intent to waive his *Miranda* rights. (*Whitson, supra,* 17 Cal.4th at p. 250.)

This record is devoid of any suggestion the police used physical or psychological pressure to elicit statements from appellant. He was not subjected to improper interrogation tactics, trickery, deceit, or lengthy questioning. (*Whitson, supra,* 17 Cal.4th at pp. 248-249.) Appellant was not induced to provide statements as a result of improper promises. Thus, as in *Whitson*, the voluntariness of appellant's waiver is clear. (*Id.* at p. 250.)

### 2. Appellant's waiver was made with a full awareness of his rights.

We next turn to the second component of the analysis, which focuses on whether appellant was aware of the rights he was giving up and the consequences of his decision to do so. (*Whitson, supra,* 17 Cal.4th at p. 250.) Yee informed appellant he was a

detective with the Fresno Police Department and he was investigating the shooting. Appellant nodded in response and said Yee could ask him questions. Appellant did not appear under the influence of any narcotic. Although appellant's voice sounded raspy at times and he coughed on occasion, we do not agree that his tone of voice reflected "great physical discomfort" throughout the interview.

Appellant asserts he is like the defendant in *Mincey*. However, appellant did not complain of pain, did not ask to stop the questioning and did not seek the help of legal counsel. Appellant was not interrogated for hours. There is insufficient evidence to determine appellant was slipping in and out of consciousness. Appellant did not complain of confusion, although he did forget which day the police came to his residence. Unlike in *Mincey*, appellant was willing to answer questions. *Mincey* is distinguishable.

Appellant, however, contends some of his answers were "patently incredible" and he appeared "seriously confused" at times. He maintains the trial court's determination that he was "rational and coherent throughout the interview is contrary to the record." When asked about the night of the shooting, appellant incorrectly said he purchased his gun that same day for protection "from Halloween." Appellant also said he fired "blanks." However, even if some of appellant's responses could be described as irrational, a position we do not take, those responses, and indeed appellant's answers overall, were responsive to the topic of the shooting. Appellant explained when and why he purchased his gun. He provided details regarding what happened when he first saw the officer at the door and what was said between them. He denied doing anything to justify being shot. He explained throwing his gun and grabbing his knife. He denied knowing why the police were at his residence, and said he and his mother "always yell." He confirmed there were two police officers who shot him. He denied wanting to hurt anyone that night.

Appellant's responses suggest he was capable of understanding the discussion. Indeed, appellant admits in his opening appellate brief that "some" of his answers

19.

"seemed responsive and appropriate" to Yee's questions. Although the issue asserted in *Panah* was whether the defendant's waiver was "involuntary" (*Panah, supra,* 35 Cal.4th at p. 471), it appears the *Panah* court also examined whether the defendant there had the capacity to waive his *Miranda* rights. (*Id.* at pp. 471-472.) Although the defendant in *Panah* was described as giving some "irrational" answers, the Supreme Court nevertheless found a valid *Miranda* waiver because the answers were "responsive" in the absence of police coercion. (*Id.* at p. 472.) Given *Panah*'s outcome, appellant's challenge is unpersuasive because he provided answers responsive to Yee's investigation in the absence of police coercion.

Like the defendant in *Perdomo*, appellant's speech was not slurred. His responses do not suggest he was incoherent. Like the defendant in *Whitson*, this record does not establish appellant lacked sufficient intelligence to understand his rights or the consequences of his waivers. Appellant had prior experience with law enforcement, which suggests an overall familiarity regarding his *Miranda* rights. (*Whitson, supra,* 17 Cal.4th at pp. 249-250.)

As noted above, it was the prosecution's burden to establish the validity of appellant's *Miranda* waiver by a preponderance of the evidence. Whether it met that burden is an independent determination we make on appeal after examining the totality of the circumstances. (*People v. Williams, supra,* 49 Cal.4th at p. 425.) We are mindful that appellant was seriously injured, he remained in the intensive care unit from the time of the shooting, and he experienced prolonged intubation. However, the prosecution met its burden based on the totality of this record. Appellant gave a voluntary waiver free of coercion or deception. His waiver was made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon those rights. (*Moran v. Burbine, supra,* 475 U.S. at p. 421.) Accordingly, the trial court did not err.

20.

## II.    The Trial Court Did Not Err in Directing the Jury to Deliberate Further.

On its first day, and after approximately five hours of cumulative deliberations, the jury indicated it could not reach a verdict on count 1 although it had reached a verdict on count 2. The court directed them to continue deliberating. Appellant asserts the trial court erred and he was prejudiced, requiring reversal of count 1.

### A.    Background.

The jury began its first day of deliberations at approximately 9:59 a.m. That afternoon, the jury requested readback of Finley's entire testimony about his arrival at appellant's residence until appellant's exit from the house with a knife. The parties were informed of the jury's request.

At approximately 2:52 p.m. that same day, the court reporter provided the requested readback testimony and exited the jury room at approximately 3:37 p.m. The jurors, however, had stopped the reporter from reading all of Finley's testimony. Upon learning that issue, the trial court directed the reporter back into the jury deliberation room and she read the remainder of Finley's testimony which was responsive to the jury's request, both from the prosecution and the defense. The court reporter entered the jury deliberation room at approximately 3:51 p.m. to do so and exited at approximately 4:09 p.m. At approximately 4:20 p.m. the jury sent a request to the court asking for its "options" because it was deadlocked and unable to reach a unanimous decision.

At approximately 4:41 p.m. the court reconvened with all parties and explained the jury's notes and the court reporter's readback of testimony. The court informed the parties of its intention to ask the jurors how many polls they had taken and whether there had been any movement in the polls. The court informed counsel it did not believe the jury had been deliberating long enough because the trial required about four and a half days of testimony and the jury had deliberated approximately five hours given its various breaks and the time taken for the readback of testimony. Defense counsel asked the court to inquire about the jury's split. The court indicated it would read CALCRIM No. 3551,

noting it was an instruction which the defense had requested, and the court would ask the jurors whether they thought additional time would be helpful to them, or any additional readback.

At approximately 4:55 p.m., the court met with all parties and the jury. The court asked the foreperson if any further deliberations, instructions or reading of testimony would assist the jury in reaching a verdict. The foreperson indicated it would not. The jury had taken five ballots up to that point, and on count 1 they were split "8 to 4." The jury had reached a verdict on count 2, which was not disclosed.

The court excused the jury again and met with counsel. At approximately 5:05 p.m. the jury was brought back into court before all parties. Using CALCRIM No. 3551 (which is titled "Further Instruction About Deliberations") the court stated the following to the jury:

> "Ladies and Gentlemen, I understand that you are divided at this point apparently 8 to 4 as to one of the counts. Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts.

> "So I ask that you please consider the following suggestions: Do not hesitate to re-examine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all the evidence with your fellow jurors.

> "It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or other jurors want to reach a verdict. Both the People and the defendant are entitled to the individual judgment of each juror.

> "It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. But it is this Court's determination that given the fact that it took four and a half days to present the evidence in this case and that you have spent now some approximately five hours deliberating, and that is taking into

22.

consideration the readback of the court reporter, it is this Court's decision that you should spend more time in attempting to reach a verdict. If you cannot, that is fine. But there's a lot of evidence for you to consider. And I don't want any of you to feel pressured because -- pressured to reach a decision.

"So I'm going to ask you to return tomorrow morning at 9:00 a.m. to continue your deliberations. If you wish to communicate with me any further, please do so in writing using the juror forms that were provided to you in the jury binder. [¶]. . .[¶] We will see you all back here tomorrow morning at 9:00 a.m. [¶] Thank you for your patience and for your diligence in considering this case. Thank you very much."

After the jury left, the court informed counsel that, if they had not heard from the jurors by noon tomorrow, the jury would be contacted the following day at 1:30 p.m. "to inquire as to their status." If they were still in the same position or close to it with an 8 to 4 split, the court would consider declaring a mistrial.

The following morning, the jury resumed deliberations at approximately 9:10 a.m. At approximately 9:18 a.m., the jury requested a laptop in order to listen to appellant's recorded interview with Yee from appellant's hospital room. A laptop was provided at approximately 9:28 a.m., and the jury returned the laptop and resumed deliberations at approximately 10:03 a.m. Thirty minutes later, the jury informed the court it had reached a verdict.

## B.    Standard of review.

Section 1140 provides that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict . . . unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." In the event of a deadlock, "[t]he court may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (*People v. Pride* (1992) 3 Cal.4th 195, 265.)

It is within a trial court's sound discretion whether to declare a hung jury or order further deliberations. (*People v. Bell* (2007) 40 Cal.4th 582, 616.) When ordering further

23.

deliberations, a trial court must be careful not to coerce the jury into giving up its independent judgment in consideration of compromise and expediency. (*Ibid.*) However, a trial court may direct further deliberations if it reasonably concludes its directions will enable the jurors to enhance their understanding of the case so long as the jurors are not pressured to reach a verdict based on the matters already discussed and considered. (*Ibid.*)

### C. Analysis.

Appellant asserts that the trial court's use of CALCRIM No. 3551, coupled with its extemporaneous statements, effectively told the four minority jurors "that they must take additional time to re-examine their views about the evidence in light of the majority's views." Appellant argues that the trial court "erroneously skewed the jury's deliberative process toward the result favored by the majority."

There is a dispute between the parties regarding whether or not appellant has forfeited or waived this issue on appeal. We need not address this dispute because, when we presume no forfeiture or waiver occurred, appellant's contentions are unpersuasive on the merits. Nothing in the record suggests the jury was coerced. The court made no statements that could be deemed as exerting undue pressure on any juror, and the court made no threats. The court did not indicate a verdict had to be reached and, indeed, the court said it was fine if they could not reach a verdict. The jurors were told not to feel pressured to reach a decision and they were reminded of their right to retain their individual opinions.

Even when a jury has deliberated for a substantial amount of time and indicates it is unable to reach a verdict, a trial court still retains discretion to require further deliberation. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 196-197 [no abuse of discretion where court ordered more deliberations following five month trial and deliberations that lasted a little over 14 hours]; *People v. Breaux* (1991) 1 Cal.4th 281, 319-320 [jury informed court it had reached an impasse after four days of deliberation,

indicated there was no chance of a verdict upon further deliberation, and was properly asked twice to deliberate further].)

Here, the court was principally concerned the jury had not deliberated for a sufficient time relative to the length and volume of the evidence received. It was not unreasonable for the court to conclude, in light of the fact the trial itself had taken four and a half days, the jury should put in a little more time than the approximate five hours it had deliberated up to that point. In light of the trial court's concerns and its statements to the jury, an abuse of discretion does not appear on this record. (*People v. Sandoval, supra,* 4 Cal.4th at pp. 196-197; *People v. Breaux, supra,* 1 Cal.4th at p. 320.)

## III. The Jury Had Sufficient Evidence to Convict Appellant in Count 1.

Appellant argues substantial evidence does not exist to support his conviction for assault with a firearm against Finley. He contends his conviction in count 1 must be reversed.

### A. Standard of review.

#### 1. Sufficiency of the evidence.

For an appeal challenging the sufficiency of evidence, we review the entire record in the light most favorable to the judgment to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt based on "'evidence that is reasonable, credible, and of solid value ....'" (*People v. Jones* (2013) 57 Cal.4th 899, 960.) In doing this review, we are not required to ask whether we believe the trial evidence established guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Rather, the issue is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence favorably for the prosecution. (*Ibid*.) We are to presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment. (*Ibid*.)

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid.

Code, § 600, subd. (b).) It is not permissible to base an inference on mere suspicion, imagination, speculation, conjecture or guess work. (*People v. Davis* (2013) 57 Cal.4th 353, 360.) A factual finding may be an inference drawn from the evidence but it cannot be based on "'"mere speculation as to probabilities without evidence." [Citation.]' [Citations.]" (*Ibid.*)

### 2. Assault.

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) An assault with a deadly weapon upon a peace officer occurs when a person commits "assault" upon a peace officer "with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer ... engaged in the performance of his or her duties, when the peace officer ... is engaged in the performance of his or her duties, ...." (§ 245, subd. (d)(2).) "'Assault and assault with a deadly weapon are general intent crimes.'" (*People v. Valdez* (2002) 27 Cal.4th 778, 787.)

### B. Analysis.

Appellant contends there is no evidence he verbally threatened the officers and he never pointed his gun at Finley. He asserts Finley could not see the barrel of his gun when he moved forward out of his bedroom and raised his right (gun) hand. He argues his gun could not have been pointed at Finley because he was "moving away from the officers and their line of sight." He maintains he "never held his gun in a manner that suggested he intended to commit a battery with it." He claims his conviction in count 1 was based on speculation, conjecture, guesswork, or supposition due to how he held his gun and the absence of any verbal threats.[4]

---

[4] In a footnote, appellant challenges Yee's testimony as factually incorrect that appellant could have pulled the trigger two or three times. Appellant provides citations to Internet hyperlinks to support his contention the trigger on a Glock semiautomatic pistol can only be pulled once when the firing chamber is empty. He contends this establishes Yee's conclusion was hyperbole, and "had no basis in reality or the evidence in this

Two cases are instructive.  First, in *People v. Escobar* (1992) 11 Cal.App.4th 502 (*Escobar*), the defendant was convicted of assault with a firearm.  The defendant held a gun but concealed it from the victim by holding it inside a briefcase.  The victim heard the defendant cock the weapon.  (*Id.* at p. 503.)  On appeal, the defendant argued there was no attempt to use the weapon to inflict injury because he did not exhibit the weapon, point it, or fire it, "but merely cocked it." (*Id.* at p. 505.)   The Court of Appeal determined the victim was aware the defendant was holding a gun and the defendant had a present ability to violently injure.  The evidence established "something more than mere preparation." (*Ibid.*)  *Escobar* noted the victim did not have to see the gun because he could rely on his sense of hearing to perceive the defendant's intent to commit a violent injury.  (*Ibid.*)  The evidence was sufficient to establish the defendant intended to willfully commit an act which, had it been completed, its direct and natural consequence was an injury to the victim.  (*Ibid*.)

Second, in *People v. Chance* (2008) 44 Cal.4th 1164 (*Chance*) sheriff's officers drove to the defendant's residence to arrest him pursuant to felony warrants.  The defendant ran from his residence and an officer pursued him on foot, observing that the defendant was carrying a handgun.  The defendant ran around the front end of a trailer and the officer approached, but anticipated an ambush.  The officer advanced the other direction around the back of the trailer and, after carefully peering around the corner, he saw the defendant facing the front end of the trailer.  (*Id.* at p. 1168.)  The defendant was holding his gun extended forward.  The officer trained his weapon on the defendant, who looked back over his shoulder at him.  The officer repeatedly told the defendant to drop

case."  Respondent objects to this challenge of Yee's testimony, arguing appellant's authorities are not part of the appellate record.  An appellate court is generally limited in its review to matters that are included in the record from the proceedings below and may not consider other matters.  (*People v. Pearson, supra,* 70 Cal.2d at p. 221, fn. 1.)  Accordingly, because these matters are not included in the record from the proceedings below, we will not consider the arguments or issues raised in appellant's opening brief at footnote number 12.

27.

his weapon, and the officer testified he was in fear for his life and afraid the defendant was going to shoot him at any second. The defendant was arrested and his gun was recovered fully loaded with 15 rounds in the magazine, although the firing chamber held no round. The gun's safety mechanism was off. (*Id.* at p. 1169.) A jury convicted the defendant of assault with a firearm on a peace officer, along with other offenses. The Court of Appeal reversed the assault conviction, concluding the defendant did not have the "'present ability[] to commit a violent injury'" necessary for assault. (*Ibid.*) The Court of Appeal concluded the defendant's act of pointing his gun at a place where he expected the officer to appear "was not immediately antecedent to a battery." (*Ibid.*) The Attorney General appealed to the Supreme Court, which reversed.

The *Chance* court held assault occurs when a defendant's actions enable him to inflict a present injury. However, "[t]here is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay." (*Chance, supra,* 44 Cal.4th at p. 1172.) Instead, when a defendant "equips and positions himself to carry out a battery," an assault is present "if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Ibid.*) "'Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." The fact an intended victim takes effective steps to avoid injury has never been held to negate this "present ability."' [Citations.]" (*Id.* at p. 1174.)

*Chance* determined the defendant's loaded weapon and concealment behind the trailer allowed him to strike immediately at the officer. The officer's evasive maneuver did not deprive the defendant of the required "'present ability'" necessary for conviction of assault. *Chance* rejected the defendant's argument that an assault did not occur because he never pointed his weapon in the officer's direction. That "degree of immediacy" was not necessary. (*Chance, supra,* 44 Cal.4th at p. 1176.) Instead, the

defendant's conduct by positioning himself to strike with a loaded weapon was sufficient to establish the actus reus required for assault. (*Ibid.*)

Here, appellant cites a series of cases where the defendant either aimed a weapon at a victim or threatened a victim while holding a weapon. He asserts he merely possessed a loaded gun so his conviction for assault was in error. However, this record demonstrates he did more than merely possess a loaded gun.

Appellant was not responsive to Finley's repeated commands to put his gun down and multiple witnesses, including appellant's siblings, testified appellant repeatedly asked Finley to shoot him in the head. During this tense confrontation appellant moved suddenly in the direction of Finley and simultaneously raised his gun arm. Under these facts, the jury had substantial evidence to determine appellant had a present ability to shoot immediately at Finley and moved with an intent to do so. Appellant was equipped and in a position to carry out a battery even if some steps remained to be taken, and even through Finley prevented the infliction of injury. (*Chance, supra,* 44 Cal.4th at p. 1172.)

Moreover, the jury heard appellant's postarrest statement that he fired two or three "blanks" and then "threw [the gun] on the ground like I can't do nothing with this." It is reasonable to infer from appellant's statements that he attempted to fire his Glock, but was unable to do so and became frustrated. Although conflicting inferences may be drawn regarding whether or not appellant tried to fire his Glock, on appeal we view the evidence in the light most favorable to the judgment (*People v. Jones, supra,* 57 Cal.4th at p. 960) and presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment. (*People v. Johnson, supra,* 26 Cal.3d at p. 576.) The inference that appellant attempted to fire his Glock is based on more than mere speculation or guesswork.

Appellant contends he never pointed his weapon in Finley's direction and could not have done so because he was moving away from Finley out of the bedroom. In his reply brief he maintains his conduct "never established that he had actual knowledge or

29.

that it was even reasonably foreseeable that his actions would probably and directly result in physical force being applied to Officer Finley." He asserts his conduct may have caused Finley to be afraid but Finley's subjective fear is irrelevant. These arguments are unpersuasive because aiming his weapon was a degree of immediacy not required for conviction of assault. (*Chance, supra,* 44 Cal.4th at p. 1176.) Further, Finley testified appellant's gun arm began to raise up before appellant exited the bedroom and turned away from him. This conduct, coupled with appellant's postarrest statements, is substantial evidence appellant had the general intent to commit assault regardless of Finley's subjective beliefs.

Based on his recorded statements to Yee, appellant also argues he told Finley he would throw out his gun if the officers left. He claims these statements are consistent with a lack of intent to commit assault with a firearm. However, in rendering its verdicts, it is clear the jury either rejected these statements or determined the remaining evidence established an intent to commit assault with a firearm. It is the trier of fact who makes credibility determinations and resolves factual disputes. (*People v. Friend* (2009) 47 Cal.4th 1, 41.) We will not reassess the credibility of the evidence on appeal. (*Ibid.*)

Based on this record, sufficient evidence exists to support the jury's determination appellant had the general intent to commit an assault with a deadly weapon upon Finley, and he had the present ability to do so. (§§ 240, 245, subd. (d)(2).) This evidence was reasonable, credible, and of solid value such that a reasonable jury could find appellant guilty beyond a reasonable doubt in count 1. (*People v. Jones, supra,* 57 Cal.4th at p. 960; *People v. Johnson, supra,* 26 Cal.3d at p. 576.) Accordingly, appellant is not entitled to reversal of count 1.

## IV.     No Cumulative Error Exists.

Appellant alleges he suffered a due process violation from cumulative errors stemming from the issues discussed above. This contention is without merit because we have rejected all of his claims. Accordingly, reversal is not warranted. (*People v.*

30.

*Bradford* (1997) 14 Cal.4th 1005, 1057 [the defendant's cumulative prejudice argument rejected based on findings each individual contention lacked merit or did not result in prejudice].)

## **DISPOSITION**

The judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
PEÑA, J.